**UNITED STATES BANKRUPTCY COURT**
**FOR THE**
**DISTRICT OF MASSACHUSETTS**

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**PETER E. GRENIER**,                          Chapter 7
     Debtor                          Case No. 06-14825

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**RIMMA VAKS and STEVEN MANGANO**,
     Plaintiffs
v.                                             Adv. P. No. 07-1131

**PETER E. GRENIER**,
     Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**MEMORANDUM**

**I.  INTRODUCTION**

      The matter before the Court is the Amended Complaint filed by the Plaintiffs,

Rimma Vaks ("Vaks") and Steven P. Mangano ("Mangano")(collectively, the "Plaintiffs").

Through their Amended Complaint, the Plaintiffs, who represented themselves in the

above-captioned adversary proceeding, seek a determination that the Debtor, Peter E.

Grenier ("Grenier" or the "Debtor"), is liable to them for damages arising out of a home construction contract and that those damages are excepted from discharge pursuant to 11 U.S.C. §§ 523(a)(2)(A) or (a)(6).

In their Amended Complaint, the Plaintiffs set forth three causes of action. In Count I, they assert that the Debtor made numerous false representations to them in connection with their home construction contract. In Count II, they assert that the Debtor wrongfully converted their money and deliberately and intentionally breached their contract with him, causing willful and malicious injuries to them and their property. Finally, in Count III, the Plaintiffs seek damages under Mass. Gen. Laws, ch. 93A, §§ 1-11 based upon the allegation that the Debtor engaged in unfair and deceptive practices, including violations of state laws and regulations applicable to home improvement contractors.

The Debtor answered the Amended Complaint. He specifically denied the material allegations made by the Plaintiffs and asserted numerous affirmative defenses in his answer.

The parties filed a Joint Pretrial Memorandum on December 28, 2007 in accordance with the Court's pretrial order. In their Joint Pretrial Memorandum, the Plaintiffs and the Debtor stipulated to certain facts. In particular, the parties stipulated that the Plaintiffs paid the Debtor $86,800 as a deposit for construction work on their home and that from October 7, 2005 to December 24, 2005, they made eight payments to the Debtor after his presentation of documents captioned "Application and Certification for Payment," as well as two additional oral requests for funds.

The Court conducted a trial on November 25, 2008 and December 8, 2008, at which

three witnesses testified.  The Plaintiffs introduced twelve exhibits into evidence.  During

pretrial proceedings, the Debtor invoked his Fifth Amendment privilege against self-

incrimination. During the trial, he neither testified nor introduced any documents into

evidence. [1]

The issues presented include whether the Plaintiffs sustained their burden of

establishing that the Debtor's obligations to them are nondischargeable and whether they

established the amount of damages they sustained as a result of the Debtor's conduct.

Based upon the stipulated facts, trial testimony, and documentary evidence, the

Court now makes the following findings of fact and conclusions of law as required by Fed.

R. Bankr. P. 7052.

## II. FINDINGS OF FACT

In the fall of 2005, the Plaintiffs hired an architect, David S. Jaquith, to design and

draft plans for substantial renovations to a house they owned at 103 Puritan Lane,

Swampscott, Massachusetts (the "property").  Jaquith had been employed by the prior

owners of the property, and they recommended him to the Plaintiffs.  The Plaintiffs solicited

bids for a general contractor but received no offers.  Jaquith then recommended Grenier as

a general contractor, giving him an excellent reference.  Jaquith reported to the Plaintiffs

that he had recently worked with Grenier on a project in Beverly, Massachusetts, and he

advised them that he would have hired Grenier for construction work on his own project

---

[1] The Debtor did not attend the trial, and, according to his counsel, he has moved
to Florida.

if he had not already employed a general contractor.

As a result of Jaquith's recommendation, the Plaintiffs interviewed Grenier. Vaks advised him that she and her spouse insisted on three conditions to his employment: 1) that he be registered as a Home Improvement Contractor under Massachusetts law; 2) that he work only on their job during the term of the contract; and 3) that she and her spouse be added as insureds under his liability insurance policy. Grenier agreed to the Plaintiffs' conditions.

Vaks testified that the reason why she and her spouse insisted on Grenier's registration as a Home Improvement Contractor ("HIC") was because, in the event they sustained damages, they could make a claim against the Commonwealth's Home Improvement Guaranty Fund.[2] In September 2005, Grenier falsely represented to the

---

[2] In <u>In re Haines</u>, 309 B.R. 668 (Bankr. D. Mass. 2004), this Court observed:

In 1991, the Massachusetts Legislature enacted legislation creating a Residential Contractors' Guaranty Fund to be administered within the office of consumer affairs and business regulation "to compensate owners for actual losses incurred by them as a result of registered contractor or subcontractor conduct which has been found by a court of competent jurisdiction to be work performed in a poor or unworkmanlike manner or which is a common law violation or a violation of any statute or regulation designed for the protection of consumers." Mass. Gen. Laws Ch. 142A, § 5. The statute authorizes a party to enforce its provisions and seek damages "in the superior court, the district court, or the small claims division of the district court," or to request arbitration in a program approved by the director or consumer affairs and business regulation. <u>Id.</u> at § 3. To obtain compensation from the Fund, an owner must establish "the contractor has filed for bankruptcy, fled the jurisdiction or the owner is otherwise unable to collect such judgment after execution" and that he or she has "exhausted all customary and reasonable efforts to collect the judgment." <u>Id.</u> at § 5.

Plaintiffs that he was currently registered as a HIC. According to the Plaintiffs, he explained to them that a building permit would not be issued without such a registration. At the time the parties entered into the contract, however, Grenier was unlicensed with the Board of Building Regulations and Standards as his license had expired on July 5, 2005. Although Grenier obtained a new HIC license in February of 2006, when he applied for the Plaintiffs' building permit from the Town of Swampscott on October 3, 2005, he provided false information on the application for the building permit. Additionally, when he worked on the Plaintiff's project, contrary to his representation, he did not possess a valid HIC registration.

Vaks also insisted that Grenier act as general contractor on only their project because of its size and scope. She testified that Grenier verbally agreed to that condition and assured her that their project would be his only job. Grenier's business records indicate, however, that he had several other pending jobs. Plaintiffs' Exhibit 8 establishes that between September 1, 2005 and November 21, 2007 Grenier had fifteen other clients and projects from which his contracting business generated income and expenses.

The Plaintiffs both testified that Jaquith's recommendation was an important factor in their decision to engage the Debtor as their general contractor. Based upon Jaquith's recommendation, as well as Grenier's representations that he held a current HIC registration and would work only on their project, the Plaintiffs and the Debtor entered into

---

309 B.R. at 671.

a "Contractor Agreement" on September 24, 2005.  The Debtor executed the contract both individually and in his capacity as owner of Grenier Contracting and Construction, LLC. Below his signature on the contract, the Debtor set forth his "Contractor's State License No." as CS 072411.

The parties, in the contract, described the scope of the work with reference to attached architectural drawings and specifications for the renovation of the property prepared by David S. Jaquith Architects.  The parties contemplated that the work was to commence on or before September 30, 2005 and was to be substantially completed by April 7, 2006.  The Plaintiffs agreed to pay Grenier $508,600 for materials and labor in connection with the contract.  In summary, Grenier was to perform all necessary exterior and interior work, including demolition, excavation of the site, pouring the foundation, framing, roofing, siding and installing windows, as well as completing all interior finish work.  The interior work included all finish carpentry, electrical, plumbing, heating and cooling work, as well as painting, for the foyer, dining room, living room, family room, kitchen, bathrooms, bedrooms, hallways, garage, office and attic.  The Plaintiffs agreed to make payments in accordance with a "Schedule of Values," which, after the required deposit in the sum of $86,800, would be payable in "Progress Payments."

Pursuant to the contract, Grenier agreed to purchase, and keep in force for the duration of the job, insurance that would protect the Plaintiffs as owners.  Additionally, he agreed he would obtain workers' compensation insurance and general liability and automobile insurance within certain limits and name the Plaintiffs as additional insureds

under the policies.  The Debtor purchased the requisite insurance under the contract as

evidence by his agent's certificate of liability insurance.  It is unclear whether the insurance

was terminated or canceled prior to its expiration date.  Vaks made a claim under one of the

policies, but the insurance company sent her a letter denying coverage of a claim of injury,

stating that the policy was no longer in effect.

   The Plaintiffs paid Grenier a deposit in the sum of $86,800 on September 24, 2005.

During their discussions about the deposit, Grenier told the Plaintiffs that it would be used

to order lumber, to obtain a building permit, and to hire a framer.  The Town of Swampscott

issued a building permit in early October of 2005, and Grenier commenced work on October

3, 2005.  Unbeknownst to the Plaintiffs, the check given by the Debtor to the Town of

Swampscott for the building permit bounced.

   In early October, 2005, Grenier's bank account was overdrawn in the approximate

sum of $34,500.  His bank account statements reveal that he did not use any of the Plaintiffs'

deposit to purchase materials for their job.  Rather, he used the deposit for purposes other

than renovations to the property.  Although the contract documents did not earmark the

Plaintiffs' funds to their project, Grenier had agreed that he would not perform work on

any other projects while he was working on the Plaintiffs' renovation project.  Thus, Grenier

made false representations to the Plaintiffs when he told them he would use their deposit

for purchasing lumber, for obtaining a building permit, and for engaging a framing

contractor.

   The Debtor and the Plaintiffs agreed on a procedure for the submission of

requisitions for payment. Grenier was to submit the requisitions to the Plaintiffs at weekly meetings. Grenier submitted numerous requisitions each captioned "Application and Certification for Payment." The document consisted of two parts. The Contractor's Application for Payment (the "Applications for Payment") and the Architect's or Owner's Certification for Payment (the "Certification for Payment").[3] The Applications for Payment required the Debtor to disclose information about the work performed, including "Total Completed and Stored to Date," which referenced column G of the Continuation Sheet attached to each Application and Certification for Payment, "Total Earned Less Retainage," "Current Payment Due," and "Balance to Finish. Each Application for Payment contained the following paragraph:

> The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that the current payment shown herein is now due.

In his Applications for Payment, Grenier certified that the work covered by each Application for Payment was completed in accordance with the contract documents, that he had paid all amounts required for work for which prior Applications for Payment were submitted and for which he had received payments from the Plaintiffs, and that the current payment was then due.

The Architect's and Owner's Certificate for Payment contained the following

---

[3] The Applications were standard AIA documents, identified as "AIA Document G702."

language:

> In accordance with the Contract Documents, based on on-site observations and the data comprising the application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

The only difference between the two Certifications for Payment was the signature line. Mangano executed six Certifications as owner, and one as architect. In so doing, he certified that the work had progressed as set forth by Grenier in the Application for Payment. The Plaintiffs did not ask Jaquith to oversee or assess the Debtor's work in relation to the contract benchmarks before they paid Grenier in connection with his requisitions.

Vaks testified that Grenier explained to her and her spouse that the document captioned "Application and Certification for Payment" was not intended to mean that work had been in fact completed, but rather that he needed full payment to order materials and to pay suppliers and subcontractors. Grenier's explanation was inconsistent with the terms of the Applications for Payment, which contemplated payment only for work that had been completed.

A Continuation Sheet was attached to each Application for Payment. The Continuation Sheets contained a table, listing the following categories relating to the work in nine columns identified with letters of the alphabet: A - "Item Number," B - "Description of Work," C - "Scheduled Value," D and E - "Work Completed," which was broken down into work completed from the previous application and work completed for the present period (D + E), F - "Materials Presently Stored (Not in D or E)," G - "Total Completed and

Stored to Date (D + E + F)" and  "% (G ÷ C), and H - "Balance to Finish (C- G)." The rows

in the table initially were comprised of twenty-four item numbers with a corresponding

description of the work and its value.  For example, the first item number was the deposit

which had a Scheduled Value of $86,800 [sic].  The fourth item, by way of a further example,

was Lumber Delivery with a Scheduled Value of $44,500.

In connection with several of the Applications for Payment, Grenier represented that

certain materials had been ordered or purchased and that subcontractors had been paid

when in fact that was not the case.  Grenier's representations were false as the Plaintiffs later

discovered from subcontractors who had not been paid.

As noted above, the Plaintiffs paid the deposit in connection with the first

Application and Certification for Payment dated September 23, 2005, which Mangano

executed one day later on September 24, 2005.  Grenier's initial representations as to how

he intended to use the funds were false as he used the funds for purposes unrelated to the

Plaintiffs' project and his business' bank account was overdrawn at the time.   His

misrepresentations,  especially his representation that he was a registered HIC, coupled

with Jaquith's recommendation, induced the Plaintiffs to give him the deposit to commence

work on their project.  Grenier's misrepresentation continued, developing in to a pattern

and practice of inducing the Plaintiffs to pay him, despite his failure to adhere to contract

requirements.  As will be discussed below and based in part upon the evidence of Grenier's

criminal convictions for larceny, Grenier was practiced at deception.

In connection with the second Application for Payment, dated October 7, 2005, which

-10-

was signed by Mangano, Grenier requested a payment of $63,400. The Plaintiffs paid that sum based upon Grenier's false representation that he had paid for the delivery of lumber with a Scheduled Value of $44,500, had completed site clearance, excavation and demolition work with a Scheduled Value of $13,900, and had performed $5,000 dollars worth of work toward "Frame in" with a Scheduled Value of $34,000.

In connection with the third Application for Payment presented to the Plaintiffs one week later on October 14, 2005, Grenier requested $12,500, falsely indicating that he had paid an electrical contractor $5,000. He also billed an additional $7,500 for framing. Mangano executed the Certification for Payment, and the Plaintiffs paid the third requisition.

Grenier prepared a fourth Application for Payment on October 20, 2005 in which he requested $73,150. In the Continuation Sheet attached to the Application for Payment, he represented that the foundation was 76.19% complete, and he sought an $8,000 payment toward the total Scheduled Value for that work of $10,500. He also represented that the purchase of windows and exterior doors was "Completed and Stored to Date." He made similar representations with respect to the exterior finish work. Indeed, at that point in the term of the contract, he represented that over 46% of the work valued at $235,850 had been completed, a representation that was false. The Plaintiffs paid Grenier the full $73,150 claimed in connection with his fourth requisition, and Mangano executed the Certification for Payment.

On October 27, 2005, Grenier presented the Plaintiffs with an Application for

Payment in the sum of $23,300, representing that that sum was needed to pay subcontractors. Again, the Plaintiffs paid the requisition in full, and Mangano executed the Certification.

In connection with the requisition dated November 17, 2005, Grenier represented that $59,500 was due for work performed, including exterior finish work, plumbing, heating and air conditioning work, as well as electrical work. These systems had not been completed, and the Plaintiffs knew it. Grenier did not represent in the Application for Payment that the work had been entirely completed. He did, however, indicate that 59.52% of plumbing work had been completed, 52.63% of air conditioning work had been completed, 52.63% of the radiant heating system had been completed, and 48.08 % of the electrical work had been completed. The Plaintiffs paid Grenier $59,500 on November 17, 2005 based upon his representation that he needed the money to pay subcontractors to ensure that they would show up and perform the work and so that he could buy materials.

In an Application for Payment dated December 10, 2005, Grenier requested $45,000, representing that he had paid subcontractors for siding, plumbing, heating, air conditioning and electrical work. Although the Plaintiffs paid the $45,000, they did not execute the Certification. At the time of the December requisition, the Plaintiffs had paid Grenier $363,650.[4]

The Plaintiffs testified that they did not understand that Applications and Certifications for Payment and the requisition process to mean that the work had been

---

[4] A change order valued at $3,150 increased the contract sum to $511,650.

completed when the Application for Payment was submitted.   Their understanding,
however, is inconsistent with the explicit terms of the Applications for Payment in which
the Debtor certified that work and materials covered by the Application had been
performed or purchased.  Moreover, Mangano, in his Certifications for Payment, attested
that work had progressed in the manner set forth in the Applications for Payment, that the
quality of the work was in accordance with the contract, and that the Grenier was entitled
to the payment of the requisition amount. The Continuation Sheets attached to Applications
for Payment also referenced work completed, not work to be completed.

By their own admission, the Plaintiffs paid a substantial amount of money knowing
that work had not been performed or completed as set forth in the Applications for
Payment.  For example, in their filing with the Commonwealth's Department of Public
Safety's Board of Building Regulations and Standards, dated October 3, 2006, approximately
one year after the contract was executed, the Plaintiffs indicated that they had paid Grenier
$35,000 for the installation of radiant heating when the house was not even framed and that
they had paid him $3,500 for finishing the garage floor when the garage framing had not
been completed.  Nevertheless, the Plaintiffs established that, in connection with all of the
requisitions, Grenier made representations inconsistent with the Applications for Payment
in that work was not completed as reflected on the requisitions.

On December 20, 2005, Grenier represented to the Plaintiffs that a $20,000 check
which they had given him had bounced.  He requested that the Plaintiffs provide him with
a replacement check.  The Plaintiffs acceded to his request.  In fact, Grenier had negotiated

-13-

the first check and misrepresented the status of that check. Vaks testified, however, that she believed that her bank balance was sufficient to cover the $20,000 check.

In a letter dated May 25, 2006 to Estee Ormont, the Program Coordinator for the Department of Public Safety, Board of Building Regulations and Standards, Vaks wrote that "[f]or the first three months [of the contract] the work progressed more or less on schedule." By the end of December, according to Vaks, she and her husband had paid Grenier $393,800.[5] In her letter, Vaks recounted that on or around December 20, 2005, the couple recognized that work at the job site essentially had stopped. Additionally, they realized that they had paid substantially more money to Grenier than he had earned based upon the status of the project. They complained to Grenier about the lack of progress, and he, in turn, proffered "one excuse after another." According to the requisitions, most of the heating, rough electrical work, plumbing work, air conditioning work, garage floor, and siding had been completed and Grenier had been paid for these aspects of the project. The Plaintiffs indicated, however, that these aspects of the job did not approach completion in mid-December 2005.

Having recognized that there were serious problems with the project and that it was behind schedule, the Plaintiffs met with Grenier in January of 2006. They asked him to explain where their money had gone. At that time, Grenier represented to them that he was holding $49,300 "on deposit," a statement that led them to believe that he had segregated

---

[5] The Application for Payment reflects payments up to December 10, 2005 of $363,650.

money in a separate account which could be accessed for their project.  That representation was false, as the bank statements for Grenier Contracting, Inc. [sic], as well as those of Grenier's spouse, Kerry, from  TD Banknorth, admitted as Plaintiff's Exhibit 2, reflect that no such sum, segregated or otherwise, existed.  In fact, during the month of January of 2006, Grenier Contracting's account was overdrawn in excess of $12,000, and Kerry Grenier's account did not have anywhere near that amount on deposit at any time during January of 2006.

In total, by February of 2006, according to an unsigned Application and Certification for Payment for the period to February 22, 2006, the Plaintiffs had paid Grenier $393,650.  They paid him another $10,000 in February of 2006 as requested in an Application for Payment.  According to Vaks, the Plaintiffs paid $10,000 to Grenier even though Vaks knew that he had lied to them because " they felt sorry for him."  On May 19, 2006, Grenier quit.

At the time Grenier ceased work on the project, the garage had been demolished, the foundation was poured, the addition had been framed, and some siding had been installed.  According to the Plaintiffs, most of the work under the contract remained to be completed, including plumbing and electrical work.  Moreover, in the winter and spring of 2006, several subcontractors complained to the Plaintiffs that they had not been paid.  In February of 2006, the framing subcontractor stopped work because of nonpayment.  During the next three months, the Plaintiffs learned that Grenier had not paid the lumber supplier, the heating contractor, the electrical contractor, the plumbing contractor, the air conditioning contractor, the painter, and the dumpster fee.  Additionally, they learned that Grenier

bounced checks to the framing contractor.

Vaks testified at trial that, in her estimation, only $23,000 of their money went to the Plaintiffs' project.  She supported this figure with Plaintiff's Exhibit 8, a statement of Grenier's business income and expenses dated November 21, 2008.  There was conflicting evidence, however.  In their letter to the Board of Building Registration and Standards dated May 25, 2006, the Plaintiffs represented that they estimated that Grenier had spent about $150,000 on their project.

According to the Plaintiffs, they had paid Grenier a total of  $403,650 before he quit. The Plaintiffs introduced Exhibit 9 to substantiate payments of $355,993 to replacement subcontractors they engaged to complete the work specified in the contract.  In addition, they worked on the house themselves and indicated that an additional sum of $15,800 was required to complete the project.  Jaquith, in his testimony, was unable to estimate the value of the work performed by Grenier, because he did not know how much Grenier had paid subcontractors.

The Plaintiffs filed a complaint against Grenier with the Commonwealth of Massachusetts, Department of Public Safety, Board of Building Regulations and Standards which regulates Home Improvement Contractors.  After a hearing, the Board, in a decision dated December 29, 2006, found, among other things, that the Debtor was not registered as a Home Improvement Contractor at the time he entered into the contract with the Plaintiffs. The Board found that Grenier's registration as a HIC had expired on July 5, 2005, two and a half months before Grenier and the Plaintiffs executed the construction contract for the

addition to the Swampscott property.  Grenier did not obtain a new HIC registration until

February 21, 2006.  Thus, as noted above, when Grenier signed the contract with the

Plaintiffs and obtained the building permit from the Town of Swampscott on October 3,

2005, he was not registered as a HIC.

The Board also found that the Plaintiffs demonstrated by substantial and credible

evidence that Grenier violated Mass. Gen. Laws ch. 142A, § 17(1) by operating without a

certificate of registration.  It suspended his subsequently obtained license for one year and

imposed a penalty of $2,000.  The Board also suspended Grenier's Construction Supervisor

license.

The Plaintiffs also filed a criminal complaint against the Debtor In Lynn District

Court. Grenier was found guilty of violating Mass. Gen. Laws ch. 142A, § 19 with respect

to the Plaintiffs' project and was fined $500.[6]  The Plaintiffs also established that, in addition

---

[6] The statute provides:

Any contractor or subcontractor who shall knowingly, willfully, or
negligently operate without obtaining a certificate of registration as
required by this chapter and who is not otherwise exempt from the
registration requirement or any contractor or subcontractor who continues
to operate after revocation of or during suspension of, or who fails to
renew his certificate of registration, shall be punished by a fine not
exceeding five thousand dollars or imprisonment not exceeding two
years, or both.

Any person who knowingly and willfully violates any of the provisions of
this chapter, with respect to which a greater penalty is not otherwise
provided by the provisions of this chapter or by any other law may be
punished by a fine of not more than two thousand dollars or by
imprisonment for not more than one year or both.

-17-

to that conviction, the Debtor had four other criminal convictions since 2006, having been

convicted of larceny by false pretenses twice and convicted of larceny by check twice.

## III.  DISCUSSION

    A.  <u>Legal Principles</u>

    Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge liabilities for

money, property or services to the extent obtained by false pretenses, a false representation

or actual fraud.  In <u>Casella Waste Mgmt. of Mass. v. Romano (In re Romano)</u>, 385 B.R. 12

(Bankr. D. Mass. 2008), this Court summarized applicable law as follows:

> According to the United States Bankruptcy Appellate Panel for the First
> Circuit in <u>Aoki v. Atto Corp. (In re Aoki)</u>, 323 B.R. 803 (1st Cir. BAP 2005),
>
>> In order to establish that a debt is nondischargeable under this
>> section, a creditor must prove actual fraud, rather than mere
>> fraud implied in law. *See* Lawrence P. King, 3 Collier on
>> Bankruptcy ¶ 523.08[1] (15th ed. rev.2002). The elements of
>> actual fraud include:
>>
>>> (1) the debtor made a knowingly false
>>> representation or one made in reckless disregard
>>> of the truth;
>>> (2) the debtor intended to deceive;
>>> (3) the debtor intended to induce the creditor to
>>> rely upon the false statement;
>>> (4) the creditor actually relied upon the
>>> misrepresentation;

---

Such fines and imprisonment shall be in addition to any administrative
penalty otherwise applicable thereto and may be sought in an action
brought by the attorney general or the district attorney.

Mass. Gen. Laws ch. 142A, § 19.

(5) the creditor's reliance was justifiable; and
(6) the reliance upon the false statement caused
damage.

Aoki, 323 B.R. at 814 (citing McCrory v. Spigel (In re Spigel), 260 F.3d 27, 32
(1st Cir. 2001), and Palmacci v. Umpierrez, 121 F.3d 781, 786 (1st Cir. 1997)).
According to the court, "[t]he first two elements of the Palmacci test describe
the conduct and scienter required to show the debtor's fraudulent conduct
generally . . . [while] . . . [t]he last four elements embody the requirement that
the creditor's claim must arise as a direct result of the debtor's fraud." Id.
(citing Spigel, 260 F.3d at 32). All six elements must be established by a
preponderance of the evidence. See Grogan v. Garner, 498 U.S. 279, 291, 111
S.Ct. 654, 112 L.Ed.2d 755 (1991).

385 B.R. at 27.

Intent to deceive presents a factual question which courts determine by considering

a variety of factors, including the debtor's financial condition at the time the representations

were made and the debtor's false representations to others. See Taylor v. DeFalco (In re

DeFalco), 353 B.R. 449 (Bankr. W.D. Pa. 2006). Intent to deceive may be inferred when it is

shown that the debtor did not have the intention of performing his obligations under the

contract. See Fensick v. Segala (In re Segala), 133 B.R. 261, 264 (Bankr. D. Mass. 1991)(citing

Merchants Nat'l Bank & Trust Co. v. Pappas (In re Pappas), 661 F.2d 82 (7th Cir. 1981))("a

contract to perform home improvements implies an intent to perform in accordance with

the contract."). See also OSB Mfg., Inc. v. Hathaway (In re Hathaway), 364 B.R. 220, 232

(Bankr. E.D. Va. 2007)("[A] misrepresentation occurs when funds are entrusted to a debtor

for a specific purpose, and the debtor has no intention of using the money for that

purpose.").

The element of justifiable reliance is less exacting than the concept of reasonable

-19-

reliance, and reliance is considered justifiable if the falsity of the representation would not have been readily apparent to the person to whom it was made. Field v. Mans, 516 U.S. 59 (1995). *See* 4 L. King, Collier on Bankruptcy ¶ 523.08[1][d] at 423-44.10 (15th ed. rev'd 2008). "The burden on the creditor [to show justifiable reliance] is relatively low . . . [and] . . . the creditor need not prove that he acted consistent with ordinary prudence and care." Aoki, 323 B.R. at 816 (citing Sanford Inst. for Sav. v. Gallo, 156 F.3d 71, 75 (1st Cir.1998)). This element is satisfied if the falsity of the representation is not apparent from a cursory examination or investigation, even if the creditor could ascertain the inaccuracy of the representation by checking public records. *See* In re Gallo, 156 F. 3d at 74-75. *See also* Lentz v. Spadoni (In re Spadoni), 316 F.3d 56, 59 (1st Cir. 2003).

The discharge exception under § 523(a)(2)(A) prevents the discharge of all liability caused by the debtor's fraud, including punitive double or treble damages and attorneys' fees to which a creditor would be entitled under state law. *See* Cohen v. de la Cruz, 523 U.S. 213, 221 (1998)(§ 523(a)(2)(A) excepts from discharge all liability arising from the debtor's fraud, including punitive damages assessed under state law, and any other relief that may exceed the value obtained by the debtor in connection with the fraudulent conduct); Auto Glass Wholesale, Inc. v. O'Brien (In re O'Brien), 247 B.R. 583, 590 (Bankr. D. R.I. 2000).

With respect to construction contracts, in particular, when a contractor positively misstates that he has the requisite license to perform home repairs, the false statement is a misrepresentation as a contractor has a duty to disclose his lack of a license during negotiations. *See* Pruett v. Moon (In re Moon), No. 94-4086, 1997 WL 34625685 (Bankr. E.D.

-20-

Va. Dec. 17, 1997).  Many courts have excepted debts from discharge in cases where the

debtor, a contractor, has misrepresented the status of his professional license where the

creditors sustained actual injury because of the misrepresentation.  *See, e.g.*, Sinha v. Clark

(In re Clark), 330 B.R. 702, 707 (Bankr. C.D. Ill. 2005).  A misrepresentation that a contractor

has a license when in fact the contractor does not may form the basis of an exception to

discharge under § 523(a)(2)(A) where the creditor would not have hired the contractor had

he or she known the contractor was unlicensed, where the creditor justifiably relied on the

representation, and where the creditor sustained damage from the contractor's fraud and

substandard work.  *See* McCain v. Fuselier (In re Fuselier), 211 B.R. 540 (Bankr. W.D. La.

1997); McDaniel v. Border (In re McDaniel), 181 B.R. 883 (Bankr. S.D. Tex. 1994). *But see*

Ghomeshi v. Sabban (In re Sabban), 384 B.R. 1 (B.A.P. 9th Cir. 2008)(although debtor made

misrepresentation of being licensed, creditor did not sustain damage caused by debtor's

fraud).

The court in Stevens v. Antonious (In re Antonious), 358 B.R. 172 (Bankr. E.D. Pa.

2006), ably summarized the law applicable to construction contracts.  It stated:

> To prove fraud or misrepresentation by a contractor, the creditor may
> establish that the debtor entered into the contract with the intent of never
> complying with the terms. *Compare* [First Baptist Church v. Maurer (In re]
> Maurer, 112 B.R. [710]at 713 [Bankr. E.D. Pa. 1990] (finding no fraud because
> the creditor failed to prove that the debtor never intended to complete the
> work), and In re Edmond, 5 B.R. 172, 175 (Bankr.W.D. Okla. 1980) (finding no
> evidence that the debtor accepted the payments with an intention to breach
> the contract), *with* In re Fenninger, 49 B.R. 307, 308 (Bankr. E.D. Pa.1985)
> (finding evidence of fraud because the debtor never intended to do work
> under the contract). A mere breach of the construction contract alone does not
> establish fraud or misrepresentation for purposes of section 523(a)(2)(A).
> Maurer, 112 B.R. at 713.

-21-

In addition to demonstrating an intent not to comply, a creditor may also establish the failure of a contractor to disclose or misrepresent a material fact as constituting fraud or misrepresentation under section 523(a)(2)(A). *See* In re Docteroff, 133 F.3d 210, 216-217 (3d Cir.1997). Bankruptcy courts have "overwhelmingly held that a debtor's silence regarding a material fact can constitute a false representation. . . ." In re Van Horne, 823 F.2d 1285, 1288 (8th Cir.1987), *abrogated on other grounds by* Grogan v. Garner, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

Furthermore, a "false pretense" is an "implied misrepresentation or conduct which creates and fosters a false impression, as distinguished from a 'false representation' which is an express misrepresentation." In re Haining, 119 B.R. 460, 463-464 (Bankr.D.Del.1990); *see, e.g.,* In re Hambley, 329 B.R. 382, 396 (Bankr.E.D.N.Y.2005); In re Philopulos, 313 B.R. 271, 281 (Bankr.N.D.Ill.2004). It has also been defined as any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongly induced to extend money or property to the debtor. *See, e.g.,* In re Barr, 194 B.R. 1009, 1019 (Bankr.N.D.Ill.1996). A false pretense must be fostered "willfully, knowingly, and by design; it is not the result of inadvertence." Id.

Courts have determined debts nondischargeable under section 523(a)(2)(A) involving construction contracts, when the debtor intentionally misrepresents a material fact or qualification. *See, e.g.,* In re Clark, 330 B.R. 702, 707 (Bankr. C.D. Ill.2005) (finding that the debtor's false representation that he was a licensed and insured contractor was sufficient to bring debt under the scope of section 523(a)(2)(A)); In re Bozzano, 173 B.R. 990, 994 (Bankr.M.D.N.C. 1994), *abrogated on other grounds by* Cohen v. de la Cruz, 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998), *see also* In re Fuselier, 211 B.R. 540, 545 (Bankr.W.D.La.1997) (finding the debt nondischargeable under section 523(a)(2)(A) because the debtor falsely represented to the creditors that he had a contractor's license and did so with the intent to deceive them); In re McDaniel, 181 B.R. 883, 887 (Bankr. S.D. Tex.1994) (holding the debt not discharged because the debtor falsely represented that he was an architect).

In re Antonious, 358 B.R. at 182-83.

B. <u>Analysis</u>

The unrebutted evidence established that Grenier made numerous false representations to the Plaintiffs. Specifically, he falsely represented that he was a registered HIC; that he had paid for supplies and materials with payments he had received from the Plaintiffs; and that he was holding money on their behalf for future purchases of materials and supplies; and that they had bounced a check which they had given to him, requiring a replacement check.

On the issue of Grenier's lack of a HIC registration, the evidence was unrebutted and substantiated by the criminal conviction and findings of the Board of Building Regulations and Standards. Furthermore, Vaks's testimony that the Debtor made this representation during a detailed discussion with Grenier during their initial meeting with him was credible.

The Plaintiffs also established with competent and unrebutted evidence that on numerous occasions in connection with the Applications for Payment Grenier made false representations to the Plaintiffs that he had paid subcontractors and had purchased supplies for their project. The statements on the Applications for Payment were false as subcontractors complained to the Plaintiffs that they had not been paid.

The evidence was unrebutted that Grenier made a false representation to the Plaintiffs in January of 2006 that he was holding approximately $49,000 for the payment of expenses on the Plaintiffs' project. The account records of TD Banknorth for Grenier Contracting Inc. and Kerry Grenier, the Debtor's spouse, admitted as Plaintiffs' Exhibit 2,

-23-

show that this amount of money was not available.  In fact, during the month of January 2006, Grenier Contracting's account was overdrawn.  The Debtor did not submit records for a personal account to rebut the Plaintiffs' evidence.

Finally, the evidence was unrebutted that the Debtor represented to the Plaintiffs that he would have one job, their job, during the period of the contract.  His representation was false. In fact, Grenier had a number of other jobs during the period when he worked on the Plaintiffs' project.  Plaintiff's Exhibit 8 establishes that from September 1, 2005 to November 21, 2007 the Debtor had fifteen other clients and projects from which his contracting business generated income and expenses.  Again, as Grenier did not testify, there was no evidence to contradict the Plaintiffs' evidence.

The Court finds that the Plaintiffs sustained their burden of showing that Grenier made the false representations with intention of deceiving them.  The inferences of Grenier's intent to deceive are inescapable from the unrebutted testimony and documentary evidence. His desperate financial condition, as reflected in his bank records, compels the inference that he intentionally lied to the Plaintiffs about the lack of other jobs so that he could procure a half a million dollar contract.  As to his false representations that he would use the deposit for supplies and to pay subcontractors, Grenier's intent to deceive is apparent from his overdrawn bank account at the time he took the Plaintiffs' deposit.  His false representations that he had paid for supplies and for subcontractors in connection with his Applications for Payment reflects his attempt to cover up his prior misrepresentations.  His conduct evidences an ongoing scheme to deceive the Plaintiffs about the extent of the work he and

-24-

Case 07-01131   Doc 104   Filed 03/19/09   Entered 03/19/09 15:41:48   Desc Main
Document      Page 25 of 31

his subcontractors performed to maintain a stream of payments from them.  When the Plaintiffs eventually realized the extent of the Debtor's deception and confronted him, he quit the job.

As to justifiable reliance, the evidence also was unrebutted, although at a certain point, the Plaintiffs' own testimony established that they no longer justifiably relied on the Debtor's Applications for Payment or representations and, instead, resorted to any means to get their project completed.

The Plaintiffs testified that a HIC registration was of critical importance to them and they would not have engaged Grenier if they had known he did not have a valid registration.  Like the creditor in <u>Sanford Inst. For Sav. v. Gallo</u>, 156 F.3d 71 (1st Cir. 1998), the Plaintiffs were not required to conduct a search of public records to ascertain the status of Grenier's HIC registration.

The Plaintiffs testified that they actually relied on several of Grenier's other misrepresentations, in particular, his representations made in connection with Applications for Payment, specifically that he had ordered supplies and paid subcontractors.  Whether their reliance on Grenier's representations in connection with requisitions was justifiable is a difficult question.  The issue implicates the Plaintiffs' understanding of the requisition procedure and the certification process.  Both Plaintiffs testified that they understood that their Certifications for Payment meant that they agreed to pay Grenier for the amount requested. The Plaintiffs testified that when they questioned Grenier about the reference in the requisitions to "Work Completed," Grenier explained to them that the deposits on

-25-

supplies had been made and that subcontractors had been paid.  The Court finds their
testimony to be credible, especially when coupled with  the Debtor's representations at the
time of each requisition.  The Debtor played upon the Plaintiffs' good will and even made
them feel sorry for him in February of 2006.  It was not necessary for the Plaintiffs to
independently investigate Grenier's representations that he had paid subcontractors and
suppliers or to involve their architect in investigating Grenier's representations as to the
requisitions in order to sustain their burden of proving justifiable reliance.  Moreover, it was
unnecessary for the Plaintiffs to scour the job site to actually ascertain the percentage
completion of plumbing and electrical work, which would be difficult for them to ascertain
without special knowledge of construction projects.  Under the circumstances, the Court
finds that the Plaintiffs' reliance on Grenier's  representations with respect to his
Applications for Payment was justifiable through the November 15, 2005 requisition.
Mangano signed Certifications for Payment up to and including that date.   The
Continuation Sheet attached to the November 17, 2005 Application for Payment reflected
the Debtor's contrivance that close to or more than half of certain work had been performed
on the project.  After the November Application for Payment, however, the Plaintiffs clearly
became suspicious of the Debtor's representations and what he set forth in the Applications
for Payment.  Neither the Debtor nor  Mangano executed the Application and Certification
for Payment in December 2005 or thereafter.  Accordingly, the Court finds that the Plaintiffs
no longer relied *at all* on the Debtor's representations after the payment of $59,500 in mid-
November of 2005.

This finding is consistent with the Plaintiffs' complaint to the Board of Building Regulations and Standards, in which they indicated that on or around December 20, 2005 the work at the job site essentially stopped. Thus, Mangano did not sign the Certification for Payment presented to the Plaintiffs on or around December 10, 2005. The December 10, 2005 Application for Payment reflects that the Plaintiffs had paid the Debtor $363,650.

There were two misrepresentations on which the Plaintiffs did not justifiably rely. The first related to Grenier's misrepresentation that the Plaintiffs needed to replace a $20,000 check which purportedly had bounced. The Plaintiffs should have known that this was a misrepresentation, as Vaks testified that she believed that her bank balance was sufficient to cover the $20,000 check. The second instance related to Grenier's representation that he needed $10,000 which resulted in the Plaintiffs' payment of that sum to him in February of 2006. Vaks testified that she paid this amount to Grenier at that time, not because she relied upon him to perform work on the project, but because "she felt sorry for him." That testimony precludes a finding of justifiable reliance.

The harm caused to the Plaintiffs and the damages which they sustained by virtue of the Debtor's misrepresentations is difficult to assess because the evidence was unclear and convoluted. At the outset, the Court rejects as unsubstantiated the assertion in the Debtor's Post-Trial Brief that the Plaintiffs received $400,000 worth of work. There was no credible evidence to support that assertion. Jaquith did not express such an opinion. In fact, his testimony was that he could not give an opinion on the value of the Debtor's work without additional information.

The total contract price was $508,600, plus $3,150 attributable to a change order, for a total of $511,750.  There was insufficient evidence of the value of the work and materials provided by Grenier, given Jaquith's hesitancy to provide an opinion, the absence of expert testimony on the issue, and the Debtor's refusal to testify.  The Plaintiffs testified that they paid Grenier a total of $403,650. The Plaintiffs introduced evidence that they paid an additional $340,193 to subcontractors and to the Town of Swampscott to obtain an occupancy permit.  Additionally, they indicated that  $15,800 needed to be expended to finish the remaining work, all without regard to the value of worked they performed by themselves.  Mangano admitted that $120,746 of this amount was paid by them but was not included within the Applications for Payment submitted to them by Grenier.

Although the Plaintiffs' evidence of their damages was deficient in that they failed to adequately establish the value of the work that the Debtor provided in relation to the monies they spent in engaging subcontractors to substantially complete the project, this Court finds that the amount of money that the Debtor obtained by fraud totaled $363,650, as they sustained their burden of showing each element of the exception to discharge under 11 U.S.C. § 523(a)(2)(A) with respect to that amount.  They would not have employed the Debtor but for his fraud, and they would not have paid him pursuant to the Applications for Payment but for his fraud.  Moreover, this sum is close to what the Plaintiffs were obligated to spend to complete the contract.

> When a creditor establishes that a debtor fraudulently induced the creditor to enter into a transaction by a misrepresentation that goes to the essence of the transaction, i.e., a debtor's training, competency or experience to complete the work contemplated by the transaction, the misrepresentation was a

> substantial factor in entering into the transaction, the debtor's work later
> appears defective, and the creditor suffers a loss, the creditor has established
> a prima facie case that the defects derive directly from the lack of professional
> qualifications of the debtor.

Gem Ravioli, Inc. v. Creta (In re Creta), 271 B.R. 214, 220 (B.A.P. 1st Cir. 2002).  Thus, the

Court finds that the Plaintiffs established that Debtor's false representations proximately

caused them to pay him $363,650 and that that is an appropriate measure of their damage.

The Debtor's liability for all damages flowing from the Debtor's fraud is

nondischargeable, including punitive, as well as compensatory damages.  Cohen v. de la

Cruz, 523 U.S. 213, 215 (1998);  Merch. Nat'l Bank v. Moen (In re Moen), 238 B.R. 785, 795

(B.A.P. 8th Cir. 1999); Nat'l Dev. Servs., Inc. (In re Denbleyker), 251 B.R. 891, 898 (Bankr. D.

Colo. 2000). Bankruptcy courts have the exclusive jurisdiction to determine the

dischargeability of debt, and the weight of authority is that bankruptcy courts have

jurisdiction and authority to enter money judgments in nondischargeability litigation, *see*

Baker v. Friedman (In re Friedman), 300 B.R. 149, 151 (Bankr. D. Mass. 2003); *but see* Cambio

v. Mattera (In re Cambio), 353 B.R. 30 (B.A.P. 1st Cir. 2004)(minority view).  The sole

remaining issue for this Court, then, is whether this Court has the authority to assess

punitive damages or abstain from that determination.

Grenier obtained and executed the contract with the Plaintiffs based upon his false

representation that he was a registered contractor in violation of Mass. Gen. Laws ch. 142A,

§ 17(1) and he violated numerous other provisions of that statute, including making

material misrepresentations in procuring the contract, failing to pay for materials and

services rendered in connection with the contract where he had received sufficient funds as

payment for the work, and abandoning the project.  Section 17 of ch. 142A provides that "[v]iolations of any of the provisions of this chapter shall constitute an unfair or deceptive act under the provisions of chapter ninety-three A." *See* <u>Yetman v. Cavanagh</u>, 2007 Mass.App.Div. 162, 2007 WL 3241488 (Oct. 22, 2007).

Under Mass. Gen. Laws ch. 93A, § 11, a court may award "up to three, but not less than two, times" the amount of damages if the court finds that . . . the act or practice was a willful or knowing violation of section two of Chapter 93A.  The evidence submitted by the Plaintiffs unequivocally established that the Debtor willfully and knowingly engaged in "deceptive acts or practices in the conduct" of his construction business.  Accordingly, the Court shall double the damage award to the Plaintiffs.  *See* <u>Auto Glass Wholesale, Inc. v. O'Brien (In re O'Brien)</u>, 247 B.R. 583, 590 (Bankr. D. R.I. 2000).  In applying Massachusetts law, the Rhode Island bankruptcy court determined that the creditor had ipso facto established that the debtor was entitled to double damages where the debtor forged his spouses signature on a guaranty and obtained to obtain merchandise for his business.  The Debtor's conduct in procuring the contract and preparing (or fabricating) Applications for Payment warrants punitive damages.  Moreover, the records from the Board of Building Regulations and Standards established that the Plaintiffs were not alone in being victimized by the Debtor's fraud.

## IV.  CONCLUSION

In accordance with the above findings of fact and conclusions of law, the Court shall enter a judgment in favor of the Plaintiffs and against the Debtor in the sum of $727,300.  In

view of the foregoing, it is unnecessary for the Court to consider the Plaintiffs' alternative

claims under 11 U.S.C. § 523(a)(6).

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated: March 19, 2009
cc: Rimma Vaks, Steven P. Mangano, Thomas J. Flannagan, Esq.